# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: METROPOLITAN LIFE | ) | MISC. DOCKET NO. 96-179 |
| INSURANCE CO. SALES PRACTICES | ) | MDL NO. 1091 |
| LITIGATION | ) | |
| | ) | JUDGE AMBROSE |
| THIS DOCUMENT RELATES TO: | ) | MAGISTRATE JUDGE BENSON |
| | ) | |
| Amodeo        C.A. No. 96-0759 | ) | |
| Biggs         C.A. No. 96-0038 | ) | |
| Caskey        C.A. No. 95-1426 | ) | |
| Garrett       C.A. No. 96-0436 | ) | |
| Oddi          C.A. No. 96-0051 | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING THE
AWARD OF ATTORNEYS' FEES, EXPENSES AND INCENTIVE AWARDS**

This Court approved a Settlement of this class action as
fair, reasonable and adequate.  The Settlement provides more than
$1.645 billion in class-wide compensatory relief and other benefits.
See Findings of Fact and Conclusions of Law, dated December 28, 1999
(Docket # 722, "Settlement Findings").  Presently before the court
is class counsel's request for payment of attorneys' fees,
reimbursement of expenses and payment of incentive awards to class
representative plaintiffs.  MetLife has agreed to pay these
attorneys' fees and expenses in addition to the more than $1.645
billion in class-wide relief.  Thus, reduction of the agreed amount
of fees and expenses will not benefit the Class.  Moreover, these
amounts were negotiated at arm's-length with the court's approval
only after agreement on the Settlement itself was reached by the
parties.

This Court finds, and provides detail in support of this
finding below, that in light of the magnitude and complexity  of
this case, the substantial risks of loss undertaken by counsel in

this contingent litigation, the efforts of class counsel against skilled opposition, and the substantial result achieved for class members, the requested attorneys' fees, expenses and incentive awards are reasonable and warrant approval. The requested attorneys' fee of $120 million is approximately 7% of the Settlement's benefit to the Class, and is 2.2 times class counsel's actual lodestar of just over $54.9 million[1], is within the range of fee awards approved in similar cases of this magnitude and complexity.

I.   <u>The Representative Plaintiffs, the Defendants and Their Counsel</u>

1.   The Plaintiffs appointed by this Court to represent the Class in the Settlement of this class are: Charles V. Amodeo, Dennis W. Biggs, Sr., Joseph P. Garrett, Jr., Ronald R. Hess, Arthur E. Leach, Richard L. Oddi, Michael A. Rankin and Harvey J. Williams. (Docket #722 at ¶¶ 1, 87). Each of these persons was named a plaintiff in the Amended Consolidated Class Action Complaint filed in this action on August 18, 1999 ("Amended Complaint") (<u>Id</u> at ¶ 1). Each seeks an incentive award of $2,500.

2.   The Amended Complaint also named plaintiffs Juanita I. Caskey and Kristel Davis-Smith, who were proffered to represent the Class in the original Consolidated Complaint. Their claims were dismissed as to the original Complaint and were again alleged in the

---

[1]   The lodestar is based on a blended hourly rate of $229.03 with 239,736 hours actually expended by class counsel in this case.

Amended Complaint to preserve their appellate rights.  They were not proffered to represent the Class for the purposes of the Settlement (Id. at ¶ 1 fn. 1).  However, in light of their previous efforts to represent the Class in this Settlement, they also each seek an incentive award of $2,500.00.

3.   The Settlement of this class action also includes claims asserted in a number of other certified and putative class actions pending in this and other courts.  Several of the appointed and proposed class representative plaintiffs in those actions joined in the Settlement approved by this Court.  They are: Wayne A. Cope, Dallas G. Few, Ronald W. Speidel, Phillip A. Richard, Mary Ann Richard, Eleanor M. Fritz, Janet D. Goldinger (Lux), Kevin C. McCullough, Margaret McCullough, Linda Rae Mickail, Janice S. Olsen-Ahlin, John F. Olsen, Lloyd Zane Remick, Carmella Storti, Andrew J. Vehec, Lawrence Holt, Kenneth Wolbert, Luis C. Amione, Nguyen Family Life Insurance Trust, Arthur M. Falkin Trust, Selmor Green, Eunice Green, Abel Rocha, Lynda Rocha, Charles Galatro, Martha Teutsch, Randy Teutsch, Jacqueline Golding, Harold Golding, Mary T. Repp, James T. McAnallen, Jimmy R. Rodriguez, Jennifer Hari, Pearl E. Boyd, Donald Penland, Robert T. Husman, and Joyce Rabouin.  These persons also seek individual incentive awards of $2,500 for their efforts in prosecuting their class actions which have been resolved in this Settlement.  Likewise, counsel for these representative plaintiffs in their separately filed class actions have joined in the Settlement approved by this Court and the request for attorneys' fees and expenses made herein, and are listed as counsel for

-3-

plaintiffs and the Class below.

4.    The plaintiffs and the Class are represented by the
law firms of Specter Specter Evans & Manogue, P.C. and Milberg Weiss
Bershad Hynes & Lerach LLP ("Co-Lead Counsel"); Bonnett, Fairbourn,
Friedman & Balint, P.C.; David W. Dunn Law Firm PLC; Hubbard &
Biederman, LLP; Levin Fishbein Sedran & Berman; Lite DePalma
Greenberg & Rivas, LLC; Gene Mesh & Associates; Savett Frutkin
Podell & Ryan, P.C.; Schiffrin & Barroway, LLP; Spector & Roseman,
P.C.; Malakoff Doyle & Finberg, P.C.; Martin, Drought & Torres,
Inc.; Bragar Wexler  Eagle & Morgenstern, LLP; Carlin & Vasvari,
L.L.C.; Corinblit & Seltzer; Farrow, Bramson, Baskin & Plutzik, LLP;
James, Hoyer, Newcomer, Forizs & Smiljanich, P.A.; Kincaid & Horton;
Law Offices of Daniel Harris; Law Offices of George Donaldson; Law
Offices of Tas Coroneos; Longley & Maxwell, L.L.P.; The Lustigman
Firm, P.C.; Murray & Murray Co., L.P.A.; Nick O'Malley Law Offices;
Bruce A. Reznick & Associates; Sachnoff & Weaver, Ltd.; Behrend &
Ernsberger, P.C.; Johnson, Blakely, Pope, Baker, Ruppell & Burns;
Andra Todd Dreyfus, P.A.; Law Offices of Herbert Hafif; Stamell &
Schager, LLP; and Phebus & Winkelmann.    All are experienced
plaintiffs' counsel with expertise in insurance, consumer and class
action litigation. See  Joint Declaration of Melvyn I. Weiss, Esq.
and Howard A. Specter, Esq. (Docket #668, the "Weiss/Specter Decl.")
¶ 183;  Second Supplemental Affidavit of David J. Manogue In Support
Of Joint Application For An Award Of Fees And Expenses (Docket #
726, the "Manogue Second Aff.") ¶ 5 n.1.

5.    Defendant Metropolitan Life Insurance Company is a

mutual life insurance company organized under the laws of the State of New York, with its principal place of business in New York. Metropolitan Life Insurance Company is licensed in all fifty states to sell its insurance and financial products. Defendant Metropolitan Insurance and Annuity Company, a wholly owned subsidiary of Metropolitan Life Insurance Company, is a company organized under the laws of the State of Delaware, with its principal place of business in New York.[2] Affidavit of Edmund G. Rakowski (Docket #592, the "Rakowski Aff.") ¶ 2.

6.   MetLife is represented by the law firms of Skadden, Arps, Slate, Meagher & Flom LLP; McCarter & English, LLP; and Thorp Reed & Armstrong, LLP. All of these firms have extensive experience in the defense of complex and class action litigation. MetLife also is represented by experienced and able in-house counsel.

## II.   Judicial Standards For The Review Of Attorney Fee Requests

### A.   Substantial Deference Should Be Accorded To Fee Agreements Negotiated At Arm's-Length

7.   As previously noted, MetLife has agreed, subject to Court approval, to pay *whatever fees and expenses are awarded, not to exceed* $120 million of plaintiffs' counsel's fees and to reimburse the requested $2.5 million of

---

[2]   Allegations were also made against MetLife's wholly owned subsidiary, Metropolitan Tower Life Insurance Company, in the original Consolidated Class Complaint and the Amended Complaint, and under the terms of the Settlement Agreement it is released from all covered claims, as are Metropolitan Life Insurance Company and Metropolitan Insurance and Annuity Company. The term "MetLife" as used herein includes Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, and Metropolitan Tower Life Insurance Company.

plaintiffs' counsel's expenses.  This amount is over and above the benefits to be provided to the Class.  Thus, unlike many class actions, the attorneys' fees in no way reduce the benefits to Class Members, and are in addition to the other Settlement relief being made available to the Class.  Plaintiffs' counsel will not receive any additional fee for their future services in monitoring, implementing and administering the Settlement, or in defending the Settlement on appeal.  This Court recognizes that the process of determining and providing the General Relief, DAC Tax Relief and Claims Evaluation to the more than 6 million members of the Class is a substantial task that has, and will require significant time, effort and resources be expended by plaintiffs' counsel. See, e.g., In Re Prudential Ins. Co. of America Sales Practices Litigation, 962 F. Supp. 572, 590-91 (D.N.J. 1997) ("Prudential I Fee Opinion"), vacated and remanded, 148 F.3d 283 (3rd Cir. 1998).  No additional fee was requested for defense of the settlement on appeal, although no appeal of the Settlement has been maintained.

8.    The Court must review and approve counsel's fees in a class action settlement, even when the parties have, in effect, agreed upon an appropriate fee. See In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litig., 55 F.3d 768, 819-820 (3rd Cir. 1995) ("GM Trucks"); Seagoing Uniform Corp. v. Texaco, Inc., [1989-90 Tr. Binder] Fed. Sec. L. Rep. (CCH) ¶ 94, 791 (S.D.N.Y. Oct. 24, 1989).  However, absent evidence of collusion, a negotiated fee that does not diminish the amount of recovery by the Class is entitled to substantial weight and deference.    See

-6-

generally Prandini v. National Tea Co., 557 F.2d 1015 (3rd Cir. 1977); Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985) ("Third Circuit Task Force Report"). Indeed, were it otherwise, plaintiffs' counsel would have little incentive to attempt to negotiate a fee to which defendants would not object. There would be little reason to negotiate and compromise to bring a matter to closure if the Court were prepared, absent very strong reasons of record, to second-guess the parties' valuation of the services performed by plaintiffs' counsel.

9.   This Court has already found that the Settlement was negotiated at arm's-length after 10 months of arduous and hard-fought negotiation. Settlement Findings at ¶¶ 89, 106. The court has no basis for reaching a different conclusion as to the negotiated fees and expenses. The evidence and the Court's experience with the parties are, in fact, to the contrary. As Chief Magistrate Judge Benson wrote in a Memorandum Order dated November 16, 1999: "Here, there is no evidence of collusion. Indeed, the court is well aware of the true adversarial posture of the parties in this case since its inception. The court has before it no indication that this has changed ...." Importantly, plaintiffs' counsel negotiated the material terms of the Settlement prior to and separately from any discussions with defendants concerning attorneys' fees to be received in this action. It was only after the material terms of the Settlement were otherwise negotiated - and this Court gave its approval under the procedure specifically endorsed and recommended by the Court of Appeals in Prandini v.

-7-

National Tea Co., 557 F.2d 1015, 1021 (3d Cir. 1977), and by a Task

Force appointed by the Court of Appeals to report on the subject of

court-awarded attorneys' fees - that plaintiffs' counsel and

defendants entered into arm's length fee negotiations.  See Third

Circuit Task Force Report, 108 F.R.D. at 267 (quoted in Prudential

I Fee Opinion, 962 F. Supp. at 577)) (emphasis added).  Those

negotiations culminated in MetLife's agreement to pay ~~whatever fees~~ *whatever fees and*

~~expenses are awarded, not to exceed~~ *expenses are awarded, not to exceed*

~~$120~~ million in fees and up to $2.5 million in reimbursement

of expenses.[3]

> 10.  The parties in this matter have employed precisely
the procedure approved by both the District Court and Court of
Appeals in Prudential:

> The parties in this case followed the proper
> procedure.  Plaintiffs' counsel and [the
> defendant] entered into fee negotiations
> only after the Settlement Agreement was otherwise
> negotiated . . . and this Court had authorized
> a discussion of the fee question . . . .  Under
> such circumstances, there is no reason to
> believe that [the defendant's] counsel - having
> already fixed the other terms of the Settlement
> Agreement. . . - consented to the requested fee
> for any reason other than their belief in its
> reasonableness under all of the circumstances
> of this case.

Prudential I Fee Opinion, 962 F. Supp. at 577.  See also In re

Prudential Ins. Co. of America Sales Practices Litigation, 148 F.3d

283, 335 (3rd Cir. 1998) ("Prudential II") (agreeing with the

District Court on this issue).

> 11.  Moreover, the parties' negotiations were based upon

---

[3]      There is reason to believe that counsel's actual expenses
have already exceeded this amount.

-8-

a  knowledgeable analysis of what an appropriate fee would be for the benefits achieved and the fees awarded in similar situations. Plaintiffs' counsel negotiated with their adversaries, who saw the effort made by plaintiffs' counsel first hand, knew plaintiffs' counsel's lodestar in the case and were well aware of how much time was reasonably required to prosecute this case. Weiss/Specter Decl. at ¶ 162.  Counsel for MetLife had an interest in protecting MetLife's treasury and MetLife had a direct financial interest in the amount of the fee.  Counsel for MetLife are lawyers who have litigated from the defense side for many years and know the applicable law pertaining to fee awards, including Prudential II, and were able to consider and utilize as precedent fee decisions from other actions of a similar nature.  In such circumstances, the end result of those negotiations - which reflects both sides' experiences as to what is appropriate - is entitled to a great deal of weight in ruling on the fee request.

12.  In Hensley v. Eckerhart, 461 U.S. 424, 437 (1983), for example, the Supreme Court held that negotiated, agreed-upon attorneys' fee agreements, such as the one here, are the "ideal" toward which the parties should strive: "A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee." See also Matter of Continental Ill. Sec. Litig., 962 F.2d 566, 568-70 (7th Cir. 1992) (market factors, best known by the negotiating parties themselves, should determine the quantum of attorneys' fee).

13.  Similarly, in Malchman v. Davis, 761 F.2d 893 (2d

AO 72A
(Rev 8 52)

Cir. 1985), the Court of Appeals for the Second Circuit concluded that courts should be hesitant to interfere in fee arrangements between settling parties in class actions when defendants have agreed not to oppose the payment of fees up to a certain agreed-to-amount:

> [W]here . . . the amount of fees is important to the party paying them, as well as to the attorney recipient, it seems to the author of this opinion that an agreement "not to oppose" an application for fees up to a point is essential to completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged. It is difficult to see how this could be left entirely to the court for determination after the settlement.

761 F.2d at 905 n.5. See also Third Circuit Task Force Report, 108 F.R.D. at 267 (cited in Evans v. Jeff D., 475 U.S. 717, 738 n. 28 (1986)).

14. The Court's role in the present context is substantially different from that in the traditional "common fund" case, in which the awarded fee is subtracted from the total amount of money and/or benefits made available to the class, thereby diminishing those benefits. Here, plaintiffs' counsel's fee will not affect the Class recovery. This case is also very different from a "statutory fee shifting" case, in which the defendant has not agreed to pay plaintiff's counsel's fees and thus reserves the right to challenge every item of work performed that underlies the requested fee. Here, MetLife has agreed to pay the amount of fees sought by plaintiffs' counsel. Because MetLife has agreed to pay plaintiffs' counsel's fees and to reimburse counsel's expenses (up

-10-

AO 72A
(Rev 8/82)

to $2.5 million) wholly apart from any award to the Class, and because the nature of the negotiations demonstrates that this fee was not "traded off" for a lesser result for the Class, the Court need not "award" the fee as if it were being paid out of the Class recovery or being challenged item by item by the defendant. Rather, the Court need only approve the overall settlement package - including its fee and expense provisions - as fair, reasonable and adequate. See, e.g., Officers for Justice v. Civil Service Com'n. of City and County of San Francisco, 688 F.2d 615, 625 (9th Cir. 1982); In re M.D.C. Holdings Sec. Litig., 1990 U.S. Dist. LEXIS 15488, at *12-13 (S.D. Ca. Aug. 30, 1990).

15. Particularly because the fees were negotiated after the Settlement was negotiated, there is no reason for this Court to second-guess whether MetLife, a sophisticated insurance company with experienced and competent counsel not needing the Court's protection, may have underpaid or overpaid in negotiating its exposure to fees and expenses. The only consequence of such second-guessing would be a windfall to MetLife and no further benefit to the Class. Moreover, such second-guessing is completely unwarranted in this case where, as shown below, the requested fee is not excessive in comparison to other similar cases, the requested expenses are at least $1 million less than plaintiffs' counsel's actual expenses and the uncontested Affidavits of plaintiffs' counsel showing the amount of time, effort and expenses justify the amount of agreed to fees and expenses.

AO 72A
(Rev 8/82)

B.   Settlement Findings Significant To The Court's Fee Request
Evaluation.

16.   In evaluating the reasonableness of the requested
attorneys' fees and expenses, this Court notes that it has already
determined that the Settlement negotiated by Plaintiffs' counsel
provides a benefit valued at more than $1.645 billion to the Class
and that it is fair, reasonable and adequate and that plaintiffs'
counsel have provided fair, vigorous and more than adequate
representation for the Class.  Settlement Findings at ¶¶ 18, 42, 89,
127, 131.   In making this determination, the Court found that the
Settlement was negotiated at arm's-length between MetLife, its
counsel and plaintiffs' counsel after more than 10 months of arduous
negotiations and four years of hard-fought and skilled litigation
that encompassed at least 60 motions, with at least 173 supporting
briefs and related submissions, 24 hearings or conferences before
the Court, and at least 92 orders or recommendations from the Court.
Id. at ¶¶ 13, 18, 89, 106.   The issues dealt with included
substantive, procedural and discovery matters, including four
separate motions for summary judgment by MetLife. Id. at ¶ 13. This
Court also found that discovery in this litigation was massive,
entailing plaintiffs' counsel's review of 8.8 million documents and
18,164 pieces of multimedia materials.  Id. at ¶16.   This Court
has further found that continued litigation would have been
extremely costly with a substantial risk of loss for all parties.
Id. at ¶¶106, 109, 110, 118-125.   These findings weigh heavily in
favor of the requested fees, expenses and incentive awards.  It is

-12-

against this backdrop, according substantial deference to the parties' agreement concerning fees and expenses, that this Court now evaluates the fairness and reasonableness of the requested attorneys' fees, expenses and incentive awards.

C.   Entitlement To Fees And Methods For Determining Fee Award

17.   Under the "equitable fund" doctrine, established more than a century ago in <u>Internal Imp. Fund Trustees v. Greenough</u>, 105 U.S. 527 (1881), attorneys for the representative plaintiffs in litigation resulting in a recovery for a class may petition the Court to be compensated for their efforts.   The rationale for this doctrine was explained a century later in <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 479 (1980): "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."

18.   Professor Conte, acknowledging the importance of awarding fair and reasonable fees in common fund cases, has stated:

> [C]ourts have been careful to award a fully compensable reasonable fee based on the underlying economic inducement for class action lawyers to pursue potentially expensive or complex common fund class litigation. These lawyers assume the risk of no compensation unless they successfully confer common fund benefits on the class, based on their reasonable expectation that they will share in the recovery in a fair proportion, in contrast to receiving a fee based initially on time-expended criteria that fail to give the results obtained factor primary consideration.

-13-

1 A. Conte, <u>Attorney Fee Awards</u> § 1.09, at 16 (1993) (footnotes omitted, emphasis in original).

19.   The need for a significant economic inducement to class counsel is apparent in this case.   Plaintiffs' counsel have submitted Affidavits showing that they have expended nearly 240,000 hours litigating this case.   Manogue Second Aff. at Exh. 1.   These Affidavits also show that plaintiffs' counsel's actual lodestar is more than $54.9 million through December 31, 1999, for an average blended hourly rate of just over $229.00.   <u>Id.</u>   Competent counsel of stature would be unlikely to undertake a commitment of time, effort and resources of this magnitude without the possibility of a substantial return if their efforts proved successful, given the real risk of receiving no compensation at all if they lost.   Here, plaintiffs' counsel's efforts were markedly successful in providing more than a $1.645 billion benefit to the Class.   Plaintiffs' counsel's efforts after more than four years of highly contentious and truly contingent litigation, without any assurance of recovering their more than $54.9 million investment of time and resources until the very end, if at all, should now be compensated with an appropriate economic inducement.

20.   In determining whether the agreed to fee provides the appropriate economic inducement and is reasonable, this Court finds noteworthy that, despite more than ample opportunity to do so, neither MetLife nor any objector has challenged the quantity or quality of the hours expended or plaintiffs' counsel's actual lodestar as specified in their Affidavits.   <u>See</u> Manogue Second Aff.,

-14-

generally. The absence of any contest to plaintiffs' counsel's fee Affidavits undermines the position of those few who have objected to the overall reasonableness of the requested fee. It also militates strongly in favor of and allows this Court to accept the time, expenses and lodestar attested to in the Affidavits without an item-by-item inquiry or the need to micro-manage every individual effort of counsel. Merola v. Atlantic Richfield Co., 515 F.2d 165, 167 n. 2 (3rd Cir. 1975) (recognizing that an affidavit may support counsel's fee petition). Plaintiffs' counsel themselves have lightened the Court's analytical burden by presenting a unified request for fees and have agreed that Co-Lead Counsel may determine the amount of compensation for each lawyer and firm from the overall fee approved by this Court. Manual For Complex Litigation, Third, § 20.223 (1995) (approving of fee-splitting agreements among class counsel). Thus, the Court's task is not to analyze and quantify the effort and contribution of each individual lawyer or law firm (a daunting task in this case in light of the number of counsel involved). Rather, the Court must look at the overall efforts of counsel and the results achieved to evaluate the fairness and reasonableness of the requested fee or, in other words, to determine if the fee is within the range of reasonableness. See Blum v. Stetson, 465 U.S. 886, 900 n. 16 (1984); Officers for Justice v. Civil Service Com'n of City and County of San Francisco, 688 F.2d at 625.

    i.   The Percentage-Of-The-Fund Method Is Preferred

    21.   The Supreme Court of the United States and the Court

AO 72A
(Rev 8/82)

of Appeals for this Circuit, as well as numerous other Courts of Appeals and District Courts, have recognized that the percentage-of-recovery method is the preferred approach in analyzing fee applications in common fund class actions. See Blum v. Stenson, 465 U.S. 886, 900 n.16 (1984); Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 164-67 (1939); GM Trucks, 55 F.3d at 822; Prudential II, 148 F.3d at 336. The percentage-fee award is intended to approximate the market -- that is, what private counsel ordinarily would charge in a contingent-fee contract. See, e.g., McLendon v. Continental Group, Inc., 872 F. Supp. 142, 163 (D.N.J. 1994) (citing Swedish Hospital Corp. v. Shalala, 1 F.3d 1261, 1269 (D.C. Cir. 1993) (percentage method approximates way in which attorneys are compensated for such cases in marketplace)); Matter of Continental Ill. Sec. Litig., 962 F.2d at 572 ("The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.").

22. The percentage-of-fund method requires the Court to evaluate the fairness and reasonableness of the requested fee by looking at the overall efforts of counsel and the results achieved. See Blum v. Stenson, 465 U.S. at 900 n. 16. It does not require the Court to evaluate each firm, each lawyer and each minute of time spent by them as the Court would do in a "statutory fee shifting" case.[4] The wisdom and practicality of this approach is most evident

---

[4] Unlike the "common fund" case presented here, the Court in the typical "statutory fee shifting" case may not enhance the actual lodestar or take into account the overall

in a case of this magnitude where plaintiffs' counsel have submitted Affidavits demonstrating that through December 31, 1999, they have invested 239,736 hours with an actual lodestar of more than $54.9 million to litigate this case.

23.   The percentage approach is as appropriate here as it was in Prudential, or perhaps more so, where the common benefit to the Class was based largely upon a then-assumed "take rate" and other assumptions.   In this case, the entire Settlement benefit of at least $1.645 billion (net of attorneys' fees, expenses and costs) is guaranteed to be distributed regardless of take rates or any other assumptions.   Plaintiffs' requested fee of $120 million for $1.645 billion in guaranteed benefit results in a much smaller percentage than in Prudential, where the requested fee was $90 million in relation to a guaranteed benefit of $410 million.

ii   The Lodestar/Multiplier Method As An Optional Cross-Check To The Percentage-Of-The-Fund Method

24.   Like numerous other courts, this Court believes that the percentage-of-the-fund method is the best barometer for

---

efforts, results achieved or the contingent nature of the litigation.   City of Burlington v. Dague, 505 U.S. 557 (1992).   All the Court may examine to determine reasonableness in a "statutory fee" case are the hours expended, the work performed and the rate charged.   Id. Thus, a careful inquiry into those items is necessary in a "statutory fee" case, but is not necessary here, where the overall efforts of counsel, results achieved and contingent nature of the litigation can and must be considered in determining the reasonableness of the fee. Blum v. Stenson, 465 U.S. at 900 n. 16; Brown v. Phillips Petroleum Co., 838 F.2d 451, 456 (10th Cir. 1988) (in a percentage fee award, the amount of time need not be considered at all).

-17-

evaluating the fairness and reasonableness of the requested attorneys' fees. In so concluding, this Court acknowledges that a number of years ago, many federal courts employed an alternative method for calculating fee awards known as the "lodestar/multiplier" method. See, e.g., Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 116-118 (3d Cir. 1976) (en banc) ("Lindy II"). But shortly after the Supreme Court reiterated its support for the percentage approach in Blum, then-Chief Judge Aldisert, the author of Lindy II, convened the Third Circuit Task Force to reconsider Lindy because "a number of difficulties [had] been encountered in applying the [lodestar/multiplier method]." Third Circuit Task Force Report, 108 F.R.D. at 238. The Task Force identified at least nine perceived deficiencies in the Lindy "lodestar/multiplier" approach, and specifically concluded that, while Lindy continued to have merit in statutory fee-shifting cases, it should no longer be followed in common fund cases, and that fee awards in common fund cases should be based on a percentage of recovery. Id. at 254-59.

25. Today, the lodestar/multiplier method, which entails multiplying the hours expended by the attorney's current market hourly rate, and then adding an additional multiplier based on the results achieved and risks and effort involved to provide an incentive for prosecuting contingent class litigation, is used primarily as a cross-check to the percentage-of-the-fund method to show that the fee is within the realm of reasonableness. G.M. Trucks, 55 F.3d at 819 n.37; In re Fine Paper Antitrust Litig., 751

-18-

F.2d 562, 590-91 (3rd Cir. 1984).  Thus, this Court will follow the modern trend and use the lodestar/multiplier merely as a cross-check to the percentage-of-the-fund method.

D.   **Application Of The Percentage-Of-The-Fund Method Generally**

26.   The percentage method is consistent with and indeed is intended to mirror  practice in the private marketplace, where contingent-fee attorneys typically negotiate percentage-fee arrangements with their clients.  As Judge Posner emphasized in Matter of Continental Ill. Sec. Litig., 962   F.2d at 572:

> The object in awarding a reasonable attorney's fee ... is to simulate the market . . . .  The class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client.

See also Kirchoff v. Flynn, 786 F.2d 320, 324 (7th Cir. 1986) ("When the `prevailing' method of compensating lawyers for `similar services' is the contingent fee, then the contingent fee is the `market rate'") (emphasis in original).  The percentage awarded under the percentage approach should reflect the same incentives, and provide the same reward for efficient efforts, as in non-class action litigation.

i.   **Ranges Of Percentages Typically Awarded In Non-Class Cases**

27.   Contingency fees in non-class action cases typically range from 30-40%.  In their concurring opinion in Blum, Justices Brennan and Marshall observed that:

-19-

> In tort suits, an attorney might
> receive one-third of whatever amount
> the plaintiff recovers.   In those
> cases, therefore, the fee is directly
> proportional to the recovery.

465 U.S. at 904; see also In re Prudential Sec. Inc. Ltd.
Partnerships Litig., 912 F. Supp. 97, 101 (S.D. N.Y. 1996) (noting
that "investors entered retainer agreements with private counsel
which provided for a contingent fee ranging between 33-1/3% and 40%
of the amounts recovered"); Kirchoff v. Flynn, 786 F.2d at 323, 324
n.5 (observing that "40% is the customary fee in tort litigation");
In re Public Serv. Co. of New Mexico, No. 91-0536M, 1992 U.S. Dist.
LEXIS 16326, at *20 (S.D. Cal. July 28, 1992) ("If this were a non-
representative litigation, the customary fee arrangement would be
contingent, on a percentage basis, and in the range of 30% to 40% of
the recovery"); In re M.D.C. Holdings Sec. Litig., No. CV 89-0090
E(M), 1990 U.S. Dist. LEXIS 15488, at *22 (S.D. Cal. Aug. 30, 1990)
("In private contingent litigation, fee contracts have traditionally
ranged between 30% and 40% of the recovery"); Phemister v. Harcourt
Brace Jovanovich, Inc., 1984-2 Trade Cases (CCH) ¶ 66,234, at 66,995
(N.D. Ill. Sept. 14, 1984) ("The percentages agreed on [in non-class
action damage lawsuits] vary, with one-third being particularly
common"); McKenzie Constr., Inc. v. Maynard, 823 F.2d 43, 45-49 (3d
Cir. 1987) (33-1/3% contingent fee held reasonable, even though it
converted to approximately $790 per hour, which is more than the
hourly return here).

ii.   Ranges of Percentages In Class Cases

28.   Similarly, in class actions, the percentage recovery

customarily awarded is generally in the neighborhood of 25% or more. In GM Trucks, 55 F.3d at 822, the Court of Appeals noted "that the fee awards have ranged from nineteen percent to forty-five percent of the settlement fund."  See also Manual For Complex Litigation, Third, § 24.121, at 189 (1995) ("Courts applying the percentage method have generally awarded attorneys' fees in a range from 25% to 30% of the fund."); Ratner v. Bennett, No. 92-4701, 1996 U.S. Dist. LEXIS 6259, at * 23-24 (E.D. Pa. May 8, 1996) (court determined that award of 35% of settlement fund, plus interest and expenses, is reasonable); In re TSO Fin. Litig., No. 87-7903, 1989 U.S. Dist. LEXIS 8253, at *19 (E.D. Pa. July 17, 1989) (fee awards in the Third Circuit and elsewhere range from 19% to 45% of settlement fund); Goldsmith v. Tech. Solutions Co., No. 92 C 4374, 1995 U.S. Dist. LEXIS 15093, at *26 (N. D. Ill. Oct. 10, 1995) (33% is "in line with that which has, in previous cases, been approved"); In re U.S. Bioscience Sec. Litig., 155 F.R.D. 116, 122 (E.D. Pa. 1994) (applying 30% benchmark); In re Granada Partnership Sec. Litig., 803 F. Supp. 1236, 1247 (S.D. Tex. 1992) (applying a 30% benchmark); In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 533 (E.D. Pa. 1990) (fee awards from 19% to 45%); In re Duquesne Light Shareholder Litig., No. 86-1046, slip op. at 4 (W.D. Pa. May 5, 1989) ("Courts have awarded contingent fees ranging from 25-45%"); In re Warner Communications Sec. Litig., 618 F. Supp. 735, 749 (S.D. N.Y. 1985) ("Traditionally, courts in this Circuit and elsewhere have awarded fees in the 20%-50% range in class actions") (emphasis added; citing numerous cases).

-21-

E.    Determining The Appropriate Percentage In This Action

29.   As both the District Court and Court of Appeals noted in Prudential, however, percentage awards (a) generally decrease as the amount of the recovery increases, and (b) generally increase in line with the increased quality of class counsel's service to the class.   The quality factors  to be considered include: (1) the quality of the result achieved by class counsel in light of the difficulties faced, (2) the speed and efficiency of the recovery achieved by class counsel, (3) class counsel's standing, experience and expertise, (4) the skill and professionalism with which class counsel prosecuted the case, and (5) the quality and performance of opposing counsel.  Prudential II, 148 F.3d at 339-40; Prudential I Fee Opinion, 962 F.  Supp. at 580-81 (and cases cited therein).

30.   Consideration of these factors here leads the Court to conclude that the requested percentage of less than 7% of the recovery (including attorneys' fees and expenses - but excluding notice and other costs,[5] and excluding the uncapped portions of the Settlement), or at most slightly more than 7% (if all fees, expenses and costs being provided on behalf of the Class are excluded), is not excessive and should be approved.  This Court notes that if it had been asked to pass on the percentage fee four years ago at the very beginning of this litigation before the substantial efforts and

_____

[5]    The other settlement costs in this case, which are typically borne by plaintiffs, are being paid by MetLife and should also be considered. These amounts, however, were not included in the calculation of the Settlement's $1.645 billion value.

-22-

results were known, the percentage now sought would almost surely have been viewed as reasonable. See Manual For Complex Litigation, Third, § 24.23 (1995), citing Third Circuit Task Force Report, 108 F.R.D. at Chapter III (1985) (further citations omitted) (Courts routinely establish the fees to be earned at the outset of the litigation). The same would be true of a privately negotiated contingent fee at the outset of this litigation. Under these circumstances, the efforts of counsel and results achieved serve only to underscore the reasonableness of the requested fee.

        i.   Quality Of The Result Achieved By Class Counsel In Light Of The Difficulties Faced

31. This Court has already found that the more than $1.645 billion in benefits provided to the Class by the Settlement is fair and reasonable. Settlement Findings at ¶¶ 42, 127, 131. The quality of the result achieved in this case is outstanding regardless of the difficulties faced. The Settlement provides all Class Members with a fair and efficient resolution of their individual claims, with full relief -- the equivalent of a successful result at trial -- going to all Class Members with substantiated claims. Moreover, Class Members do not have to face MetLife's substantial legal defenses (such as statutes of limitations and the parol evidence rule), which would otherwise be available to MetLife and might defeat Class Members' individual claims. As Judge Wolin noted in Prudential, even level two relief -- which was designed to be approximately 50% of level three relief -- is essentially equivalent to a successful result at trial, after

-23-

attorneys' fees and expenses are deducted.  See Prudential I, 962 F. Supp. at 541-42.  Even Class Members who do not elect to participate in Claim Evaluation receive meaningful, automatic relief that directly responds to the issues in this litigation.

32.  The quality of the Settlement may also be fairly judged by the reaction of the Class to the Settlement.  This Court has already found the reaction of the Class to be favorable. Settlement Findings at ¶¶ 111-115.  Here, out of a class of more than 6 million members, only 201 objections to the Settlement were received, and many of those were withdrawn prior to the Court's ruling on the Settlement.  Id. at ¶¶ 51, 52, 112.  The Court also found the remaining objections to be without merit.  See id., generally.  Significantly, no state regulator objected to the Settlement.  Id. at ¶ 114.

33.  When one juxtaposes these results against the difficulties faced, the quality of the Settlement becomes even more compelling.  As detailed in this Court's Settlement Findings, plaintiffs' case still faced considerable legal and factual hurdles. Moreover, had a complex case such as this gone to trial, plaintiffs' counsel would have had to present numerous expert witnesses and other technical testimony and exhibits on issues of both liability and damages.  MetLife would have done the same.  There can be no guarantee that a jury would have fully sided with plaintiffs on both liability and damages.  None of this even begins to contemplate the risks of successfully obtaining and maintaining a class, or the risks -- even if plaintiffs were successful at trial -- that an

-24-

appellate court might reverse on any of the numerous issues that MetLife would raise in an appeal.

     ii.  The Speed And Efficiency Of The Recovery Achieved By Class Counsel

     34.  For a case of this magnitude and complexity, defended energetically as it was by a defendant which substantial resources, the recovery in this case was achieved in a quick and efficient manner.  In just over four years of litigation, plaintiffs' counsel -- many of whom were transferred to this Court by the MDL Panel from other districts -- organized themselves; filed a consolidated complaint; survived MetLife's 148-page motion to dismiss; requested, received (often through contentious and protracted motion practice), organized, reviewed and digested millions of pages of critical documents and other evidence; engaged in deposition discovery; survived numerous motions for summary judgment; and, most recently, filed an amended consolidated complaint that reflects much of what was learned through discovery.  The Court's docket in this case (which topped 700 docket entries at the time the settlement was approved) illustrates only the tip of the iceberg of the work which was done by counsel.  See generally Settlement Findings; Weiss/Specter Decl.  In a case of this magnitude and complexity, proceeding through all of these stages and trial and possible appeals could have taken a decade or more.  The necessary work was completed in less than half that time due in no small part to Class

AO 72A
(Rev 8/82)

Counsel's diligent efforts[6].

35. Moreover, the negotiation of the Settlement itself - an original and highly complex piece of lawyering similar to earlier settlements but specifically crafted and tailored to meet the needs of this particular litigation -- was accomplished in a remarkably short amount of time. By reaching the Settlement, the parties have dispensed with the need for continued litigation and have established a means for an extremely prompt resolution of Class Member claims against MetLife. And because plaintiffs' counsel control the Claim Evaluation process, that aspect of the Settlement, too, has proceeded quickly and efficiently, and without the need for a lengthy adversarial process and appeals to neutral arbitrators. Thus, all aspects of this case, including the Settlement itself, bespeak concern with both speed and efficiency.

36. As Judge Broderick wrote in In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525 (E.D. Pa. 1990):

> Petitioners also brought this action to a close only two years after filing the complaint, despite the problems with which they contended. This is precisely the sort of result that the percentage of recovery fee method is intended to foster and stands as a counterexample to the perennial laments about the slow pace of complex litigation.
>
> Moreover, plaintiffs' counsel

---

[6] The court has repeatedly noted the competence and professionalism of all counsel involved in this litigation, including counsel for Metlife. Settlement would not have been achieved had counsel on either side behaved in a less than exemplary fashion.

> terminated this controversy by
> settlement and thereby avoided
> burdening the federal judicial system
> with a trial and appeals . . . .
> Indeed, `it would be the height of
> folly to penalize an efficient
> attorney for settling a case on the
> ground that less total hours were
> expended in the litigation.'

SmithKline, 751 F. Supp. at 534 (citations omitted).   See also

Prandini, 557 F.2d at 1019 n.5 ("One thousand plodding hours may be

far less productive than one imaginative, brilliant hour.")

(citation omitted); In re GNC Shareholder Litig., 668 F. Supp. 450,

452 (W.D. Pa. 1987) (Ziegler, J.) ("[C]ounsel ably sought and

obtained a significant settlement fund at an early stage of the

litigation, thereby avoiding large legal costs and delay.").

        iii. Class Counsel's Standing, Experience And Expertise

        37.  Plaintiffs' counsel are some of the most experienced

class action counsel in the country with experience in the class

action litigation field generally, and particular expertise in this

type of deceptive insurance sales practices case.   They are

responsible for numerous significant settlements, as well as legal

decisions that enable litigations such as this to be prosecuted

successfully.   Their performance in cases of this sort has been

praised as "nothing short of remarkable."   Prudential I Fee Opinion,

962 F. Supp. at 585-86.   See also, e.g., Duhaime v. John Hancock

Mut. Life Ins. Co., 177 F.R.D. 54, 63-64 (D. Mass. 1997) (finding

some of same counsel "able and experienced"); Prudential I, 962 F.

Supp. at 20 (finding that some of the same counsel "have shined

throughout these proceedings" and "adroitly represented Class

-27-

Members" in arguing pretrial motions, taking discovery and ultimately negotiating a settlement for policy-owners in a "churning," "vanishing premium" and "investment plan" case); Cope v. Metropolitan Life Ins. Co., 696 N.E.2d 1001 (Ohio 1998) (certifying a class of churning victims and noting the trial court's unchallenged finding of the adequacy of counsel's representation); Willson v. New York Life Ins. Co., 1995 N.Y. Misc. LEXIS 652, at *28 (N.Y. Sup. Ct. Nov. 8, 1995) (finding some of the legal counsel here competent and zealous in a "vanishing premium" case that produced a settlement for policy owners conservatively valued in excess of $300 million).

38.   In Natal v. Transamerica Occidental Life Ins. Co., another deceptive sales practices case involving insurance, Judge Danielson made a point to comment on the professionalism of some of the same plaintiffs' counsel involved here:

> It would be hard to imagine what question I could come up with that I haven't already seen the information that I needed in the submissions that have been made to this Court. I can't remember anything so thoroughly and professionally handled in the 20-some odd years that I've been involved in the law. It is interesting, and I will note for the record, that it is interesting to see law practiced honorably. And I think all of the lawyers who have involved themselves in this case can be very proud of their profession.

Natal, No. 694829, Tr. dated June 26, 1997, at 39:3-12 (Cal. Super. Ct.). See also Bartelson v. Dean Witter & Co., 86 F.R.D. 657, 673 (E.D. Pa. 1980) (Becker, J.) (finding Co-Lead Counsel Howard A.

Specter "one of the abler, more experienced and better known class action attorneys currently practicing.").

39.   The Settlement here is the fruit of Co-Lead Counsel's experience, reputation and ability.   In discovery, plaintiffs' counsel knew what to look for, where to find it, what it meant, and how to use it.   This is evident in plaintiffs' counsel's substantially successful opposition to MetLife's four summary judgment motions, where they presented a limited number of key documents sifted from the more than 8.8 million documents they reviewed.

**iv.   The Skill And Professionalism With Which Class Counsel Prosecuted The Case**

40.   This Court, together with Chief Magistrate Judge Kenneth R. Benson (who had more day-to-day contact with the parties and with whom the Court has consulted at great length), has witnessed first-hand the skill and professionalism with which this case has been prosecuted.   On both counts, plaintiffs' counsel have performed at the highest levels of their profession.

41.   Plaintiffs' counsel's prosecution of this case may fairly be described as dogged.   Both of plaintiffs' Co-Lead Counsel investigated this matter thoroughly before filing, drafted a lengthy and substantial Complaint, and defended that Complaint against numerous attacks, both motions to dismiss and for summary judgment. Plaintiffs engaged in exhaustive discovery as previously noted.

42.   Yet, notwithstanding the emotionally-charged and highly skilled level of work on all sides, the counsel in this

-29-

litigation -— both plaintiffs' and defendants' -— have always practiced within the bounds of a highly collegial, professional relationship.  There have been no "Rambo-like" tactics on either side.  Nor have there been undue theatrics in the courtroom.  Rather, as Chief Magistrate Judge Benson has noted, one of the more remarkable aspects of this litigation has been the professionalism with which all parties have conducted themselves, so that despite the complexity and hard-fought nature of this litigation, the lawyers could, for example, pursue a highly effective and unprecedented meet-and-confer process.  In short, Class Counsel's skill and professionalism have been exemplary.

        v.    The Quality And Performance Of Opposing Counsel

43.  Class Counsel's service to the Class also may be evaluated, in part, in light of the quality and performance of the opposition.  MetLife has been represented by five prominent outside law firms:

    a.    Skadden Arps Slate Meagher & Flom LLP, including its partners Sheila Birnbaum and Irene Sullivan, are among the country's most distinguished lawyers.  Skadden Arps has an international reputation and presence, and has represented numerous insurance company defendants in similar litigations.  Sheila Birnbaum has a national reputation in the class action field.

    b.    McCarter & English, LLP, including its partners Drew Berry and John Pendleton, are lawyers with national practices.  Indeed, McCarter & English boasts one of the best reputations in the nation.  Like Skadden Arps, it regularly represents insurance companies and has developed an expertise in this area of the law.

-30-

c.   Thorp Reed & Armstrong, LLP, including its partners William M. Wycoff and Deborah Powell, are among Pennsylvania's best and most well known lawyers. Thorp Reed is also one of Pennsylvania's largest firms and has a national reputation. Like MetLife's other counsel, Thorp Reed regularly represents insurance companies in litigation, and has extensive experience in this area of the law.

d.   Debevoise & Plimpton, including its partner Lorna Schofield, who represented MetLife early in this litigation, are, like the other lawyers who have represented MetLife, among the nation's most distinguished lawyers. Indeed, Debevoise & Plimpton has probably represented more major insurance company defendants in similar litigations than any other law firm in the country. Its client list has included John Hancock, New York Life, Transamerica, Phoenix Home Life, and various American General companies.

e.   Egler, Garrett & Egler, including its partner Frederick N. Egler, Jr., who represented MetLife through much of the early stages of this litigation, are highly regarded attorneys who are well known locally and nationally. Egler, Garrett regularly represents MetLife and other insurance companies in litigation, and is especially well respected in this area of the law.

44.   Not to be overlooked are in-house counsel at MetLife. They are distinguished and experienced insurance lawyers. Accordingly, plaintiffs' counsel were confronted with a most formidable team opposing the prosecution of this litigation.

45.   The caliber of the legal work performed by the defense attorneys was superior. This Court well knows the quality of the numerous motions -- including motions to dismiss, discovery motions, and motions for summary judgment -- briefed and argued by the defendants. The defendants won some of these motions, and lost others. Many were successful in part and unsuccessful in part. Yet

-31-

despite this formidable opposition, plaintiffs' counsel were able to achieve a result that provides superior benefits to the Class.

      vi.  Percentage-Of-The-Fund Fee Awards In Other Similar Cases

    46.  Another benchmark in determining the reasonableness of the percentage-of-the-fund requested is the fees awarded in other similar cases.  One similar case, of course, is <u>Prudential</u>.  While cited <u>infra</u> for setting forth the appropriate standards by which the reasonableness of fee awards are to be evaluated, the Court of Appeals opinion in <u>Prudential II</u> reversing and remanding the award of $90 million in fees for further consideration is distinguishable in  significant respects.

    47.  The Court of Appeals in <u>Prudential II</u> remanded on the question of the appropriate percentage, directing the District Court to undertake "a more thorough examination and explication of the proper percentage to be awarded to class counsel in this case, in light of the magnitude of the recovery."[7] <u>Id.</u> at 340.

    48.  However, it is important to consider that in <u>Prudential II</u>, unlike this case, the Court of Appeals also expressed concern -- at great length -- about the extent to which class counsel were responsible for the benefits obtained.  Because the Court viewed class counsel as having built upon an earlier settlement that a Task Force of state regulators had reached with Prudential, the Court sought a better explanation from the District

---

    [7]  The District Court in <u>Prudential</u> has not yet completed the additional review directed by the Court of Appeals.

AO 72A
(Rev 8/82)

Court of its rationale for giving credit to class counsel for that portion of the result that arguably had already been obtained by the Task Force. Prudential II, 148 F.3d at 336-38. No such situation exists here. Class Counsel achieved the entirety of this Settlement.

49. In addition, the Court of Appeals was also concerned with the sufficiency of the District Court's discussion of the lodestar cross-check. In Prudential, the fee award resulted in a 5.1 multiple on the lodestar as of the date of the application.[6] Id. at 340-41. Therefore, in addition to remanding for further consideration of the appropriate percentage in light of the size of the recovery, the Court also remanded for a further explanation of why (and whether) Class Counsel should receive credit for the entire result, and why (and whether) a 5.1 multiplier was appropriate. Neither of these latter two issues is present here: no nationwide Task Force or anyone else has previously obtained any portion of the relief obtained through this Class action, and, as discussed further below, Class Counsel's lodestar, which as of December 31, 1999 stands at $54.9 million and is certain to increase, means that the requested fee would result in a multiplier of only approximately 2.2.

50. In any event, as set forth in detail below, an examination of the proper percentage to be awarded to Class Counsel

---

[6]   As a result of class counsel's continuing work in Prudential, the multiplier has dwindled to approximately 2. Similarly here, the current multiplier of approximately 2.2 will decline as Class Counsel execute their substantial Settlement-related duties going forward.

-33-

in this case, even given the magnitude of the recovery, reveals that the fee Class Counsel seek in this case, and that MetLife has agreed to pay -- representing less than 6.8% of a $1.767 billion benefit (if one includes fees and expenses in the benefit calculation) and less than 7.3% of a $1.645 billion benefit (if one excludes fees and expenses in the benefit calculation) -- is reasonable.

51.  The most clearly analogous case to this litigation on the fee issue is <u>In re  NASDAQ Market-Makers Antitrust Litigation</u>, 187 F.R.D. 465 (S.D.N.Y. 1998).  The <u>NASDAQ</u> class, like this one, was very large:  it consisted of more than one million individual and institutional investors who purchased or sold shares of class securities on the NASDAQ exchange from May 1, 1989 to May 24, 1994. <u>NASDAQ</u>, 187 F.R.D. at 470.  In November 1998, Judge Robert Sweet approved proposed settlements totaling $1.027 billion.  <u>Id.</u> at 470, 476.  The <u>NASDAQ</u> court characterized that settlement as "the largest antitrust class action recovery to date."  <u>Id.</u> at 470.  Yet Judge Sweet awarded class counsel $143.78 million in fees (and an additional $4.5 million in expenses), for a percentage award of 14%. <u>Id.</u> at 470, 489-90.

52.  Although the settlement benefit in <u>NASDAQ</u> was roughly $700 million less than the value conferred here, the fees awarded exceed those sought here by more than $23 million.  Moreover, while the <u>NASDAQ</u> fee award was 14% of the settlement fund, <u>id.</u> at 470, the fee that Class Counsel seek here is less than 6.8% of the total benefit conferred.

53.  In addition, class counsel's lodestar in <u>NASDAQ</u> was

-34-

only $36,191,751, which resulted in a lodestar multiplier of 3.97. Id. at 489. Here, Class Counsel's total lodestar is nearly $19 million more than the lodestar in NASDAQ. The multiplier here (2.2) is also substantially smaller than that awarded in NASDAQ.

54. Looked at another way, the fee awarded per class member in NASDAQ was approximately $143 (over 1 million class members and an award of almost $144 million). The amount of fee per Class Member here is only $16.43 (approximately 7.3 million policies and annuities and an award of $120 million).

55. These numbers are all the more striking because, in NASDAQ, attorneys' fees and expenses reduced the actual cash payout to each class member. Id. at 472-73. Here, by contrast, the fees and expenses that Class Counsel have requested and that MetLife has agreed to pay will be paid by MetLife in addition to the Class recovery, and will not diminish it. Even if the Court were to reduce Class Counsel's fee, that action would not benefit the Class.

56. Finally, Judge Sweet recognized, as did the Court of Appeals in Prudential, that courts generally "reduce percentage awards as the size of the recovery increases." Id. at 486. Indeed, Judge Sweet noted that, in "mega-fund cases," the range of fees awarded is frequently lower than the 14% he awarded, commonly 6-10%. Id.[9] Nevertheless, analyzing a 6-10% range against the particulars of NASDAQ, the court decided to award a higher percentage -- 14% --

---

[9]     It is noteworthy that the fee percentage requested here (6.8%) falls toward the low end of the 6-10% range of reasonableness for mega-fund cases identified by Judge Sweet in NASDAQ

-35-

for the same reasons that would argue for a larger percentage here.

57.   First, the court found that the quality of class counsel's representation and the benefit to the class were "exemplary."  Id. at 487.  Similarly here, as described above, the quality of counsel's representation and the results achieved for the Class are extraordinary.

58.   Second, Judge Sweet considered the "formidable opposition" against which the result was achieved.  Id. at 488.  Likewise here, opposing counsel were formidable.  No one questions that MetLife -- which can afford any counsel it chooses -- has secured an array of superior counsel.  As Judge Sweet wrote:  "The ability of Class Counsel to obtain record-breaking settlements in the face of a stubborn and well executed defense further evidences the excellent quality of petitioners' work."  Id.

59.   Third, Judge Sweet recognized that the "role of Class Counsel was critical, not only in achieving the significant recovery, but in framing the issues which became the subject of the later served civil investigative demands of the Antitrust Division of the Department of Justice."  Id.  Similarly here, Class Counsel played a critical role in framing issues that are now being examined by State Attorneys General and departments of insurance throughout the country.

60.   Finally, Judge Sweet considered the element of risk:

> In order to achieve this $1.027 billion settlement, Class Counsel had to, and ultimately did, overcome risks in at least four important areas by:  surmounting Defendants' motion to dismiss; certifying a broad

AO 72A
(Rev. 8/82)

> . . . class; developing credible
> classwide evidence of liability; and
> developing credible evidence of
> damages. . . . There would have been
> no recovery if Plaintiffs had failed
> in any of these [four] areas.

Id. Class Counsel here likewise had to successfully confront each of these (as well as other formidable) hurdles. Indeed, Class Counsel have -- at great expense -- litigated substantially similar class actions against other life insurance companies and lost them in their entirety.[10] To suggest that settlements in these cases are routine would be to ignore reality.

61. After carefully balancing all these factors, Judge Sweet concluded that a fee of 14% of the benefit conferred by the settlement was fair and appropriate. That same percentage applied here would translate into a $230 million fee on a $1.645 billion benefit, and an even higher fee when one considers that, in this case, the fee is part of the benefit to the Class.

62. Other billion dollar cases show that the requested fee here of $120 million, representing less than 6.8% of the total benefit conferred, is fair and reasonable. It is certainly not excessive. See In re Exxon Valdez, No. A89-0095-CV (HRH), slip op. at 5 (D. Alaska Sept. 30, 1998) (although the Court has yet to award

---

[10] See, e.g., Marks v. Lincoln Nat'l Life Ins. Co., No. 98099012/CC2977 (Md. Cir. Ct. Balt. City Sept. 14, 1998) (dismissed with prejudice), aff'd, No. 1739 (Md. Ct. Spec. App. June 7, 1999), cert. denied, No. 296 (Md. Sept. 14, 1999); Russo v. Massachusetts Mut. Life Ins. Co., No. 96-368-RJI, No. 96-409-M (N.Y. Sup. Ct. Jan. 6, 1999) (summary judgment granted); L'Elie v. Academy Ins. Group, Inc., No. 96-CI-007387 (Ky. Cir. Ct. May 15, 1998) (summary judgment granted), appeal dismissed, No. 1998-CA-002407-MR (Ky. Ct. App. Mar. 4, 1999).

-37-

counsel fees on the $5 billion recovery, it noted that its previous order suggesting fees of 22.4% was still in force); In 3-State Tobacco Settlement Lawyers to Get $8.2 Billion in Fees, Chi. Trib., Dec. 12, 1998, at 20, available in 1998 WL 2351496 (five Texas firms to receive fees of $3.3 billion or 19% of $17.3 billion settlement; eleven Florida firms to receive $3.43 billion or 25% of a $13 billion settlement; and thirteen Mississippi firms to receive $1.43 billion or 35% of a $4 billion settlement). See also A. Blum, The Rich List, Nat'l L.J., Apr. 4, 1994, at C 4 (plaintiff's trial counsel in a lawsuit between Texaco and Pennzoil received a privately negotiated fee of $420 million or 14% of a recovery of $3 billion).

63.   In short, the fees awarded (or expected) in each of the billion dollar cases discussed above -- ranging from 14% to 35% of the recovery -- are further reflective of the fact that the attorneys' fees here -- less than 7% of total benefits conferred -- are reasonable.

## III. APPLICATION OF THE LODESTAR/MULTIPLIER CROSS-CHECK IN THIS CASE

64.   Although abandoned in this Circuit as the primary method for awarding fees in a common fund or common benefit case, the lodestar/multiplier approach is a recommended and frequently used cross-check on the reasonableness of the percentage fee awarded.  When the lodestar/multiplier approach is used as a check

AO 72A
(Rev 8/82)

here, the fairness of the agreed fee is apparent.[11]

65.   Plaintiffs' counsel have expended nearly 240,000 hours in this litigation.   The hours expended through December 31, 1999 (including names of the persons performing the services, the hours worked by each person, and the non-contingent billing rate for each person) are set forth in the separate affidavits submitted by each petitioning law firm.   See Manogue Second Aff., generally. Plaintiffs' counsel will also have significant continuing responsibilities going forward, including overseeing and implementing the claims process.

66.   In assessing the lodestar, the Court should evaluate whether the hours expended by plaintiffs' counsel are reasonable. First, it should be noted that neither MetLife nor any objector has

---

[11]   Lodestar is derived by first multiplying the hours expended on the engagement by current hourly rates.   See, e.g., GM Trucks, 55 F.3d at 819 n.37; Skelton v. General Motors Corp., 860 F.2d 250, 255 n.5 (7th Cir. 1988), cert. denied, 493 U.S. 810 (1989).   In computing the lodestar, the hourly billing rate to be applied is the market value of such time, i.e., the hourly rate that normally is charged in the community where counsel who initiated and prosecuted the action practice cases of this type (here, complex class action litigations).   See In re Fine Paper Antitrust Litig., 751 F.2d 562, 590-91 (3d Cir. 1984) (citing Blum for proposition that lodestar standard is prevailing market rate in relevant community); Lindy Bros. Buildings, Inc. of Phila. v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3rd Cir. 1973) ("Lindy I") ("The value of an attorney's time generally is reflected in his normal billing rate").   The lodestar figure typically includes compensation for time spent by paralegals in connection with the prosecution of the case. Since it is customary to bill paralegals at hourly rates, their time should be compensated accordingly.   See Matter of Continental Ill. Sec. Litig., 962 F.2d at 569 (district court erred by refusing to allow paralegal services to be compensated at market rates).

AO 72A
(Rev.8-82)

made any challenge to the reasonableness of the hours expended by plaintiffs' counsel, despite ample opportunity to do so.  Second, Chief Magistrate Judge Benson has noted on more than one occasion that the efforts of counsel to meet-and-confer and to minimize discovery disputes were important in the orderly and efficient conduct of this litigation.  Third, plaintiffs' counsel from the inception of this litigation proposed case management provisions that were adopted by this Court to avoid duplication of effort.  For example, plaintiffs' counsel at several case management conferences argued in favor of a provision adopted by this Court that required MetLife to produce documents it had already produced in other related actions.  (Docket # 9, Case Management Order No. 1, dated May 1, 1996 at § XIV).  This provision avoided the need for plaintiffs to request and fight for the production of numerous documents.  This no doubt aided in the orderly and efficient conduct of this litigation.  Fourth, this Court recognizes that plaintiffs' counsel had the daunting task of reviewing the 8.8 million documents and 18,164 pieces of multimedia materials produced by MetLife.  It is not unreasonable that it took plaintiffs' counsel years to review all of this material, employing approximately 50 attorneys on a full-time basis to conduct that review.  Weiss/Specter Decl. at ¶ 57.  Indeed, that this review was both necessary and productive is best evidenced by plaintiffs' counsel's submission of key documents sifted from MetLife's massive production to support their substantially successful opposition to MetLife's four summary judgment motions, as well as in dealing with the more than 60 other

-40-

motions presented to this Court throughout the more than four year history of this litigation.   This Court therefore finds that in light of the magnitude and complexity of this litigation and the demonstrably necessary, efficient and effective efforts of plaintiffs' counsel in prosecuting this litigation, the hours expended by plaintiffs' counsel as specified in their fee Affidavits are reasonable.   See Manogue Second Aff., generally.

67.   This Court also finds that plaintiffs' counsel's blended hourly rate of $229.03 is reasonable.   To determine if the hourly rate is reasonable, the Court must see if counsel's rates are in line with the market rates.   In re Fine Paper Antitrust Litig., 751 F.2d at 590-91.   Plaintiffs' counsel involved in this litigation are from Pittsburgh, New York City, Newark, Philadelphia, Dallas, Tampa, San Francisco,  Phoenix and various other cities throughout the country.   Although the blended hourly rate of plaintiffs' counsel is fairly within the market rate in Pittsburgh, this Court notes that the market rate in each of these areas varies, with some substantially higher than in Pittsburgh.   This Court also notes that this is not the run-of-the-mill case.   It is a highly complex and massive litigation.   Plaintiffs' counsel in this case are highly skilled and experienced in this very sort of insurance practices litigation, which was a necessity in successfully prosecuting this case.   Under these circumstances, the blended hourly rate of $229.03 is within the range of reasonable market rates for such complex, nationwide litigation. See, e.g., Walker v. U. S. Dept. of Housing and Urban Dev., 99 F.3d 761, 770 (5th Cir. 1996) (in a civil rights

-41-

class action hourly rates of $125.00 to $275.00 approved as market rates in Dallas); In re Lease Oil Antitrust Litig., 186 F.R.D. 403, 448 (S.D. Tex. 1999) (approving hourly rates that "ranged from $100/hour to $544/hour, for an average of $260/hour" in a nationwide antitrust class litigation); Rendler v. Gambone Brothers Dev. Co., 1999 W.L. 252395 (E.D. Pa. Apr. 27, 1999) (approving in a real estate sales class action rates of $325 per hour and $300 per hour as market rates in Philadelphia); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving hourly rates "ranging from $165 an hour to $475" in a complex nationwide antitrust class litigation); Charles v. Goodyear Tire and Rubber Co., 976 F. Supp. 321, 326 (D.N.J. 1997) (approving a blended hourly rate of $306.00 in a nationwide consumer class action).

        68.   In using the lodestar/multiplier approach as a check on a percentage-fee award, lodestar itself is merely the starting point, and the Court should take into account various other factors. The Court can adjust the lodestar upward to take account of such factors as (i) the contingent nature of the fee and the consequent risk of non-payment, (ii) the riskiness of the case, (iii) the quality of representation, (iv) the result achieved, and (v) the standing of counsel.   Lindy I, 487 F.2d at 168-69; Lindy II, 540 F.2d at 112, 116-18; In re Fine Paper Antitrust Litig., 751 F.2d at 583-84.   In adjusting the lodestar, courts have also taken into account such matters as the need to encourage experienced and able private counsel to undertake such litigation.   See, e.g., In re Warner Communications Sec. Litig., 618 F. Supp. 735, 750-51 (S.D.

N.Y. 1985).

69.   In this case, these factors militate strongly in favor of a substantial multiplier, although the Court need not determine just what it ought to be.  Plaintiffs' fee and expense request represents a multiplier of only approximately 2.2 on their $54.9 million lodestar through December 31, 1999, and more work remains to be done.  That multiplier is not excessive.  Much higher multipliers have frequently been awarded.  See, e.g., Weiss v. Mercedes-Benz of North America, Inc., 899 F. Supp. 1297, 1304 (D.N.J. 1995) (awarding fee that resulted in a multiplier of 9.3 times hourly rate); Glendora Community Redev. Agency v. Demeter, 202 Cal. Rptr. 389, 398-99 (Ct. App. 1984) (fee award was 12 times lodestar); In re Metro Mobile CTS, Inc. Shareholders Litig., No. 12300, slip op. at 6 (Del. Ch. Aug. 18, 1993) (awarding fee of 16.67% of $50.4 million recovery; although fee was equivalent to approximately $4,000 per hour, "[c]ounsel did not undertake representation on an hourly basis and they should not be encouraged to litigate longer than necessary in order to justify a fee request") (described in 17 Class Action Reports 122 (1994) and Donovan, Nat'l L.J., Sept. 13, 1993, at 15).  See also In re RJR Nabisco, Inc. Sec. Litig., No. 818, 1992 U.S. Dist. LEXIS 12702, at *15, *22 (S.D.N.Y. Aug. 24, 1992) (multiplier of 8.74); Cosgrove v. Sullivan, 759 F. Supp. 166, 167 n.1 (S.D.N.Y. 1991) (multiplier of 8.74 based on $1 million fee against lodestar of $114,398).

70.   Accordingly, when the lodestar/multiplier approach is considered, plaintiffs' request is comfortably within the range of

reasonableness. Moreover, this Court recognizes that plaintiffs' counsel's lodestar does not include future time that will no doubt be required by the substantial continuing responsibilities under the Settlement Agreement. These continuing responsibilities include training, monitoring and consulting with the Claim Evaluator, selecting and monitoring the arbitrators for Parts VIII and IX, resolving administration issues that develop with defense counsel, verifying and allocating any spillover amounts from or pro rata adjustments to the CRP Total Fund, and overseeing, monitoring and answering class member questions from the "800" telephone banks established in this case.

71. Plaintiffs' counsel's lodestar is not, of course, at the level it would have been had plaintiffs continued this litigation through trial. But plaintiffs' counsel should be rewarded, not penalized, for bringing this case to as early a conclusion as possible. Indeed, one of the several problems with the lodestar/multiplier method recognized by the Third Circuit Task Force is that it creates a disincentive for early settlement. See Third Circuit Task Force Report, 108 F.R.D. at 246-49.

A. Contingent Nature Of The Fee And The Consequent Risk Of Non-Payment

72. Plaintiffs' counsel undertook to prosecute this action without any assurance of payment. Yet, from the inception, there was a significant possibility that plaintiffs' counsel would obtain no recovery, and hence no compensation. Plaintiffs' counsel would face hurdles in proving, to the satisfaction of a jury, both

-44-

the liability of defendants and the amount of damages suffered by the Class. Moreover, as the Second Circuit recognized in City of Detroit v. Grinnell Corp., 495 F.2d 448, 471 (2d Cir. 1974), "despite the most vigorous and competent of efforts, success is never guaranteed." The high caliber of plaintiffs' counsel and the vigor and imagination with which they pursued these actions provided no assurance that they would prevail at trial or achieve any settlement at all, much less the extraordinary settlement that this Court has previously approved.

73. The risk of non-payment in complex cases such as this one is very real and is heightened when plaintiffs' counsel press to achieve the very best result for those they represent. There are numerous class and representative actions in which plaintiffs' counsel expended thousands of hours and yet received no compensation whatsoever despite their diligence and expertise. For example, plaintiffs' counsel in this action have fully litigated many cases through motion practice, pre-trial discovery, and trial that they lost and for which, consequently, they never will be compensated.[12]

---

[12]   See, e.g., Bentley v. Legent Corp., 849 F. Supp. 429 (E.D. Va. 1994), aff'd, 50 F.3d 6 (4th Cir. 1995); Industry Network Sys. v. Armstrong World Indus. Inc., No. 84-3837 JWB (D.N.J. Sept. 26, 1994) (plaintiff lost retrial of antitrust/breach of contract/tortious interference action in 1994; affirmed by the Court of Appeals for the Third Circuit in 1995); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990), aff'd, 928 F.2d 590 (2d Cir.), cert. denied, 502 U.S. 818 (1991); Krinsk v. Fund Asset Management, Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir.), cert. denied, 493 U.S. 919 (1989); Landy v. Amsterdam, 815 F.2d 925 (3d Cir. 1987); Radol v. Thomas, 772 F.2d 244 (6th Cir. 1985), cert. denied, 477 U.S. 903 (1986); Rosenblatt v. Getty Oil Co., No. 5278, 1983 WL 8936 (Del. Ch. Sept. 19, 1983), aff'd,

AO 72A
(Rev. 8/82)

Moreover, numerous cases, including life insurance sales practice cases, have been lost on summary judgment after years of· intensive work.  See infra at ¶ 60 n. 7.

74.  As one court has explained:

> The court is well aware that there are numerous contingent cases such as this where plaintiff's counsel, after investing thousands of hours of time and effort, have received no compensation whatsoever.  Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award. . . .  In evaluating [the contingent fee] factor the Court will not ignore the pecuniary loss suffered by plaintiff's counsel in other actions where counsel received little or no fee.

Ressler v. Jacobson, 149 F.R.D. 651, 656-57 (M.D. Fla. 1992) (citations omitted).

B.    The Quality Of Representation

75.  The awareness of defendants and their counsel that the leading members of the plaintiffs' Bar are prepared and willing to risk substantial, sometimes staggering stakes, by going to trial, rather than accept an unsatisfactory settlement, leads to meaningful recoveries in actions such as these.  That awareness is essential to the ability of plaintiffs' counsel to bargain effectively on behalf of their clients.

---

493 A.2d 929 (Del. 1985); In re Aluminum Phosphide Antitrust Litig., No. 93-2452, 1995 U.S. Dist. LEXIS 16335 (D. Kan. Oct. 18, 1995); Gelman v. Westinghouse Elec. Corp., 73 F.R.D. 60 (W.D. Pa. 1976), appeal dismissed, 556 F.2d 699 (3rd Cir. 1977).

AO 72A
(Rev 8/82)

76.   As previously discussed, the result achieved and the quality of the services provided are also "important" factors to be considered in assessing the reasonableness of the attorneys' fees requested.  Prandini, 557 F.2d at 1019-20 ("the `quality' factor requires the court to adjust a fee on the basis of results of the work performed"); Behrens v. Wometco Enters. Inc., 118 F.R.D. 534, 547-48 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990) ("The quality of work performed in a case that settles before trial is best measured by the benefit obtained.").

C.   The Result Achieved

77.   The benefits achieved here by plaintiffs' counsel are extraordinary, particularly in light of the legal and factual complexity of these cases and the significant difficulties of establishing liability and proving damages.  The result achieved speaks most eloquently concerning the quality of the services rendered by plaintiffs' counsel.

D.   The Standing Of Opposing Counsel

78.   The quality of opposing counsel is also important in evaluating the quality of the services rendered by plaintiffs' counsel.  See, e.g., In re Warner Communications, 618 F. Supp. at 749; In re King Resources Co. Sec. Litig., 420 F. Supp. 610, 634 (D. Colo. 1976); Arenson v. Bd. of Trade of City of Chicago, 372 F. Supp. 1349, 1351 (N.D. Ill. 1974).  As described above, the defendant in this action was vigorously represented by five prominent and able defense firms — Skadden Arps Slate Meagher & Flom LLP; McCarter & English, LLP; Thorp Reed & Armstrong, LLP; Debevoise

-47-

& Plimpton; and Egler, Garrett & Egler.  Moreover, in-house counsel

at MetLife are all capable and experienced insurance lawyers.  The

ability of plaintiffs' counsel to obtain a favorable settlement for

the Class in the face of the formidable legal opposition which the

Court observed further evidences the superior quality of their work.

E.   Enhancements Are Necessary To Encourage Experienced
Private Counsel To Undertake Such Large And Complex Litigation

79.  Many courts have recognized that generous fee awards

in cases such as this serve the dual purpose of encouraging

representatives, acting as "private attorneys general," to seek

redress for damages caused to plaintiff classes and to discourage

future misconduct of a similar nature:

> Every successful suit duly rewarded
> encourages other suits to redress
> misconduct and by the same token
> discourages misconduct which would
> occasion suit.
>
> * * * * *
>
> In some areas of the law, society is
> dependent upon "the initiative of
> lawyers . . . for the assertion of
> rights" . . . and the maintenance of
> desired standards of conduct.  The
> prospect of handsome compensation is
> held out as an inducement to
> encourage lawyers to bring such
> suits.

Dolgow v. Anderson, 43 F.R.D. 472, 487, 494 (E.D.N.Y. 1968)

(citations omitted), rev'd. and remanded on other grounds, 438 F.2d

825 (2nd Cir. 1970).

80.  Courts, therefore, look with favor upon awarding

counsel fees in class actions that "encourage the vigilance of

AO 72A
(Rev 8/82)

private attorneys general to provide corporate therapy protecting the public investor who might otherwise be victimized.". <u>Grace v. Ludwig</u>, 484 F.2d 1262, 1267 (2d Cir. 1973), <u>cert. denied</u>, 416 U.S. 905 (1974); <u>GM Trucks</u>, 55 F.3d at 784 (cost-spreading in class actions enhances "means for private attorney general enforcement and resulting deterrence of wrongdoing") (citation omitted). Class actions in particular have been recognized as an invaluable safeguard of public rights. <u>Phillips Petroleum Co. v. Shutts</u>, 472 U.S. 797, 809 (1985); <u>J.I. Case Co. v. Borak</u>, 377 U.S. 426 (1964); <u>Lerch v. Citizens First Bancorp, Inc.</u>, 144 F.R.D. 247, 250 (D.N.J. 1992); 4 <u>Newberg</u>, § 21.01, at 21-23.

81. Furthering this policy, fee allowances to plaintiffs' counsel in class actions traditionally have been awarded not merely as compensation for their efforts in the action, but as an incentive:

> Private attorneys general have been encouraged by the courts to tilt the balance for justice by the awarding of generous fees. <u>See Surowitz v. Hilton Hotels Corp.</u>, 383 U.S. 363, 371, 15 L. Ed. 2d 807, 86 S. Ct. 845 (1966). In this kind of case, as Judge Hough once said, the recovery is "like a case of salvage on a derelict." Public policy is, at times, quite compatible with generosity for in this kind of case the general public does not pay.

<u>Rosenfeld v. Black</u>, 56 F.R.D. 604, 605 (S.D.N.Y. 1972).

82. Former Judge Abraham Sofaer succinctly set forth the reasons for providing financial incentives for capable counsel in class actions:

> It unquestionably is true that
> without able lawyers handling these
> matters not only do some of them go
> unprosecuted, but the big difference
> in my experience is in the amount
> obtained and you don't get the
> highest recovery when you are paying
> at the low end of the scale of fee
> recovery in contingent actions, it
> seems to me, that I as the protector
> of the class can fairly say, and
> honestly say, that I believe it is in
> the class' best interest — of this
> class and of future classes yet
> unknown — to pay this kind of money
> for these kinds of benefits.

In re Pepsico Sec. Litig., No. 82-Civ-8403, Transcript at 17-18

(S.D.N.Y. Apr. 26, 1985) (quoted in 1 A. Conte, Attorney Fee Awards

§ 1.04, at 6 n.33 (1986)).

83.   This attitude of generosity in awarding fees in

"private attorneys general" cases plainly supports the fee award

requested in this case.

IV.   OBJECTIONS TO THE REQUESTED FEE

84.   Fewer than forty of the more than six million Class

Members have objected to the amount of attorneys' fees that MetLife,

through arm's-length negotiations, has agreed to pay to plaintiffs'

counsel.[13]  Several believe that plaintiffs' lawyers were acting not

---

[13]   Objectors to the requested fee are: Gail Alexander, Eric
G. Anderson, Robert K. Andrews, William F. Berardi,
Maryann Betts, Thomas H. Blehl, Frederick C. Bramley,
Regis R. Burdelsky, David G. and Joanne Cain, John B.
Carlin, Early Realty of Joliet II, William R. Fabrizio,
Joseph D. Giglietti, Joseph N. Giglietti, Heinz L.
Gundlach, Jur., Jeanne W. Hovde, Dana L. Kalal, Christine
L. Lanier, Douglas M. Lemon, Daniel P. and Kathleen A.
Loughry, George J. Mattackal, Patrick H. McElwee, Joyce
Moore, Thomas Norton de Matos, Ohannes G. Persekian,
Travis M. Pierce, Frances Sabbia, Michael R. Slavin, Kent

AO 72A
(Rev 8/82)

in the best interests of the Class, but simply to secure a fee. None of these objectors filed a brief or other materials to support their objections nor did any of them appear or present evidence at the hearing held by this Court on January 13, 2000 on the requested fee. The Court is not persuaded by these objections. Indeed, given the number of Class Members, this minuscule number of objections to the fee further confirms the reasonableness of the request.

85. First, the parties entered their fee negotiations only after the principal terms of the Settlement had been agreed upon, and with the explicit permission of the Court under the procedure endorsed and recommended in <u>Prandini v. National Tea Co.</u>, 557 F.2d 1015, 1021 (3d Cir. 1977). <u>See also</u> Weiss/Specter Decl. at ¶ 161. There is, therefore, absolutely no evidence of collusion between the parties. As Chief Magistrate Judge Benson wrote in his Memorandum Order dated November 16, 1999: "Here, there is no evidence of collusion. Indeed, the court is well aware of the true adversarial posture of the parties in this case since its inception. The court has before it no indication that this has changed . . . ." Moreover, the fee is being paid separately from and in addition to the amounts benefitting the Class, and in no way diminishes the benefits to the Class. Thus, a reduction in the fee will not result in a corresponding benefit to the Class. Similarly, because the fees to be paid by MetLife are in addition to the Settlement

---

David Steele, Allan Stern, Debra A. Tama, Paul B. Tucker, Paul M. Wagoner, Lee Wallenfang, Debra Ruth Wolin, Michelle A. Daniels (Michelle D. Ellison), Cathelene Dunlop, Arthur T. Stimus, Jr. and Bonnie Youngblood.

benefits, MetLife had every economic incentive to negotiate as small a fee award as possible.

86.  Second, the objections overlook the enormous benefit that the Class will receive from the Settlement -- a benefit conservatively valued at $1.645 billion, and one that was achieved only through the extraordinary commitment of time and resources by plaintiffs' counsel.

87.  Third, the objections reflect a profound misunderstanding of the contentious character of this litigation and the significant risk of non-recovery faced by plaintiffs at the outset.  The record before the Court reflects the enormous resources dedicated to this litigation over several years by lawyers from across the country.  Both the litigation and settlement phases of this lawsuit were, though civil, contentious and at all times conducted at arm's length.[14]  Indeed, the Consolidated Class Action has to date encompassed at least sixty motions with at least 173 supporting briefs and related submissions, twenty-four hearings or conferences with the Court, and at least ninety-two orders or recommendations from the Court.  The parties prepared over 400 pages of briefs on MetLife's motion to dismiss alone, and plaintiffs later had to respond to four separate motions for summary judgment.

88.  In addition, plaintiffs' counsel reviewed and

---

[14]  Melvyn I. Weiss and Howard A. Specter have attested to the intensity and contentiousness of the parties' ten-month negotiation leading to the Settlement.  Weiss/Specter Decl. at ¶¶ 66-71.  Thus, the suggestion of two objectors that the Settlement was "hastily constructed" is simply without foundation and contrary to the Court's own observations, experience, and prior Settlement Findings.

organized approximately 8.8 million documents and 18,164 pieces of
multimedia material (including four million pages of documents
produced to the MDL Depository in Pittsburgh, 4,500 boxes of sales
and training materials produced in Newark, New Jersey, and many
thousands of pages of documents received pursuant to Freedom of
Information Act requests), and deposed several high-level MetLife
personnel. To date, this effort represents a lodestar of over $54.9
million. See generally Weiss/Specter Decl. at ¶¶ 27-65; Manogue
Second Aff. And plaintiffs' counsel have continuing obligations to
this case for which no additional compensation will be awarded. See
infra at ¶ 7.

89. In short, the objections fail to appreciate the
realities of the work necessary to litigate a complex nationwide
class action of this magnitude, while trivializing the real and
substantial benefits realized at no cost to the Class. They are not
well taken.

V.   REIMBURSEMENT OF EXPENSES

90. Plaintiffs' counsel's expenses are properly
recoverable. See In re Businessland Sec. Litig., No. C-90-20476-
RFP, 1991 U.S. Dist. LEXIS 8962, at *6 (N.D. Cal. June 14, 1991)
(citing cases). The relevant expense information is detailed in the
separate affidavits of petitioning counsel. See generally Manogue
Second Aff. Significantly, the more than $3.5 million in expenses
incurred by plaintiffs' counsel through December 31, 1999 already
exceeds the $2.5 million MetLife has agreed to pay by more than a
million dollars, and thereby effectively reduces the fee requested.

Moreover, plaintiffs expect to incur substantial additional expenses going forward. In this context, the one objection by Michelle A. Daniels-Ellison to the reimbursement of $2.5 million in expenses as being excessive is without merit.

## VI. INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

91. As set forth in the Notice to the Class, Class representatives, through their counsel, are each applying for an award of $2,500 to be paid from the fund established to provide relief in the Claim Review Process, in addition to the relief that each is entitled to under the Settlement. See supra at ¶¶ 1-3 for a complete list of the class representatives seeking an incentive award. These payments are warranted as a matter of public policy and are supported by substantial authority from this jurisdiction.

92. Numerous cases in this District have awarded payments of $2,500.00 or more to class representatives for their valuable services in enforcing the law, including:

- Fox v. Integra Fin. Corp., No. 90-1504, slip op. at 4 (W.D. Pa. July 9, 1996) (Cohill, J.) (incentive award of $2,500 to each representative plaintiff);

- In re Chambers Dev. Co. Sec. Litig., 912 F. Supp. 852, 863 (W.D. Pa. 1995) (Lee, J.) (incentive award of $2,500 to each representative plaintiff);

- In re Ashland Oil Spill Litig., No. M-14670, 1990 U.S. Dist. LEXIS 20866, at *6 (W.D. Pa. Feb. 16, 1990) (Smith, J.) (incentive award of $2,500 to each plaintiff); and

- In re GNC Shareholder Litig., 668 F. Supp. 450, 451 (W.D. Pa. 1987) (Ziegler, J.) (incentive award of $3,000 to each plaintiff).

Thus, the four objections that the $2,500.00 incentive awards sought here are excessive are not persuasive.[15]

93. Plaintiffs diligently pursued this action and expended substantial time and effort during the litigation. Many participated actively in the discovery process by responding to interrogatories, searching for documents responsive to production requests, and sitting for detailed depositions. Their willingness to pursue claims on behalf of millions of others was a vitally necessary component of producing the $1.645 billion benefit that is being conferred upon the Class. The requested incentive awards are, therefore, appropriate and reasonable.

VII. CONCLUSION

94. For all the foregoing reasons, the Court finds that the negotiated attorneys' fee of $120 million is fair and reasonable in comparison to other similar cases and is more than justified by the skilled and substantial efforts of counsel when compared to the $1.645 billion benefit to the Class that will not be diminished by this award of fees. The Court also finds that the requested expenses of $2.5 million are fair and reasonable, especially in light of the fact that plaintiffs' counsel's actual expenses exceed $3.5 million. The Court further finds that the requested incentive awards of $2,500 are fair and reasonable in light of the class representatives' significant efforts in this case. The requested

---

[15]   The objectors to the incentive awards are: Michelle A. Daniels (Michelle D. Ellison), Cathelene Dunlop, Arthur T. Stimus, Jr. and Bonnie Youngblood.

AO 72A
(Rev 8 82)

attorneys' fees, expenses and incentive award should therefore be approved.


DONETTA W. AMBROSE
UNITED STATES DISTRICT JUDGE


Dated:    July 26, 2000


cc:  Counsel of record.


-56-